# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

JAMEL WHITT,             )
                               )
        Petitioner,       )
                               )
    vs.                  )        Case No. 4:12CV1595 CDP
                               )
TROY STEELE,            )
                               )
        Respondent.     )

## MEMORANDUM AND ORDER

Jamel Whitt is serving life sentences in custody of the Potosi Correctional Center for the double murder of his grandmother and her boyfriend. Whitt brings this petition for a writ of habeas corpus under 28 U.S.C. § 2254. Whitt's first ground for relief – error by the trial court in not *sua sponte* ordering a second competency hearing – fails because the court properly relied on medical evidence that Whitt was competent. Whitt's second ground for relief – insufficient evidence of deliberation in the killing of the boyfriend – fails because there was evidence that the victim was stabbed over thirty times. Whitt's third ground for relief – ineffective assistance of trial counsel for failing to assert the defenses of diminished capacity or mental disease – fails because trial counsel made a reasonable decision to eschew that defense in favor of another defense. Whitt's fourth ground for relief – ineffective assistance of trial counsel for failing to call

witnesses to show Whitt's incompetency – fails because Whitt was not prejudiced by the decision. Finally, Whitt's fifth ground for relief – ineffective assistance of trial counsel for failing to seek suppression of Whitt's confessions – also fails because Whitt was not prejudiced by the admission of the confessions. I will deny the petition.

## Background

Whitt was charged in state court with two counts of murder in the first degree[1] and one count of armed criminal action.[2] For approximately two years, Whitt was adjudged incompetent to stand trial. Eventually, Whitt was determined to be competent. Following a bench trial on January 29, 2009, he was convicted of all counts. The conviction was upheld on direct appeal in a published opinion filed March 9, 2010. On May 10, 2010, Whitt filed a pro se motion for post-conviction relief in the state court under Missouri Supreme Court Rule 29.15, and an amended motion was filed approximately five months later with assistance of appointed counsel. The amended motion for post-conviction relief was denied without a hearing on March 8, 2011, and fourteen months later the Missouri Court of Appeals upheld Whitt's appeal from that denial.

In affirming the conviction and sentence, the Missouri Court of Appeals, Eastern District, described the competency proceedings as follows:

---

[1] R.S. Mo. § 565.020 (2000).
[2] R.S. Mo. § 571.015.

The complaint charging Defendant was filed April 24, 2005. On or about April 25, 2005, the trial court issued the following order:

> Defendant appears confined in open court having been unresponsive to the Public Defender's efforts to interview him, having been on overnight suicide watch and having acted out in court in a manner to suggest the need for a mental evaluation. Whereupon the court orders the Public Defender's office to represent the defendant, that he be taken for a psychiatric examination, that he be provided his prescribed medications . . . as determined necessary and that he be maintained on a suicide watch.

The trial court also granted Defendant's Motion for Appointment of Psychiatrist, continued the cause, and committed Defendant to the Department of Mental Health (DMH) for a mental examination pursuant to Sections 552.020 and 552.030. Defendant's cause was removed from the trial docket and placed on the Mental Examination Docket on April 25, 2005.

At a certification hearing held on July 25, 2005, Defendant filed a Motion to Declare the Defendant Incompetent. Based on a previously filed psychiatric evaluation report and the record, the trial court found that Defendant lacked the mental fitness to proceed and ordered the cause suspended. The court ordered that the Defendant be committed to DMH; and ordered DMH to evaluate Defendant's mental ability and capacity within six months, and to submit to the trial court a progress report within 30 days of the evaluation. The cause was placed on the Mental Inactive Docket.

On August 30, 2006, the trial court took up the Review of Competency to Stand Trial filed by DMH and Fulton State Hospital. After considering a Pre-Trial Mental Evaluation report prepared by Erica Kempker, Psy. D. (Dr. Kempker) and Jeffrey S. Kline, Ph. D., dated August 2, 2006, the trial court found Defendant remained incompetent to proceed to trial and ordered Defendant's continued commitment to DMH with reevaluation within six months.

In February of 2007, the Director of DMH filed a Motion to Proceed, indicating that the staff of Fulton State Hospital where Defendant was being treated had determined that Defendant's unfitness to proceed no longer endured and that Defendant had the capacity to understand the proceedings against him and to assist in his own defense. Defendant filed an objection to the motion to proceed on February 21, 2007, requesting the court to order a second private examination. On March 15, 2007, the trial court continued the cause to allow Defendant to undergo a private evaluation.

On or about June 19, 2007, the State and Defendant jointly filed an agreement as to DMH's Motion to Proceed, indicating that Defendant had no additional witnesses to present regarding his competence, that both parties agreed Dr. Kempker's report contained sufficient information for the court to make its ruling, and that both parties agreed to submit the report without the necessity of a hearing.

In an order dated June 26, 2007, the trial court found that Defendant was no longer incompetent due to active schizophrenia and was no longer incompetent due to mild mental retardation, and that Defendant had the capacity to understand the proceedings against him and the nature of the judicial process. The court determined Defendant was able to assist in his defense and granted the Motion to Proceed. In making its determination, the trial court relied particularly on Dr. Kempker's report, noting that she had evaluated Defendant on February 8, 2006; July 31, 2006; and January 24, 2007.

The trial court noted that Dr. Kempker's last evaluation made no mention of mild mental retardation, but rather contained diagnoses of Antisocial Personality Disorder and Borderline Intellectual Functioning. The trial court indicated that this most recent evaluation concluded that Defendant had the capacity to understand the proceedings against him and the nature of the judicial process, and that Defendant was in full remission. Additionally, the trial court noted "that a strong suspicion of malingering appears in the diagnosis section. There are apparent inconsistencies in the defendant's psychotic symptoms, level of functioning and vocabulary skills. It appears the defendant displays lower functioning skills during evaluations than he does in regular daily interaction with others."

On February 29, 2008, upon Defendant's request, the trial court ordered Fulton State Hospital to permit Dr. Richard Scott contact visits with Defendant for the purposes of a private pretrial psychological evaluation. On June 3, 2008, upon Defendant's request, the trial court ordered the hospital to permit Dr. Robert Gordon contact visits with Defendant for a private pretrial psychological evaluation.

Defendant waived jury trial, and the cause proceeded to a bench trial on or about January 26, 2009. Prior to the commencement of the proceedings on January 26, the trial court examined Dr. Kempker on the record. In response to the trial court's inquiry as to whether she had an opportunity to observe Defendant or had Defendant under the observance of her staff since the completion of her January 24, 2007 report, Dr. Kempker stated that the treatment team at Fulton State Hospital had continued to observe Defendant and document his behaviors since that time. Dr. Kempker stated that she had reviewed this documentation and nothing contained in it would lead her to believe that Defendant was mentally incompetent to assist in his trial. Dr. Kempker testified that there had been no changes in Defendant's condition since January 24, 2007, and stated that she had seen Defendant casually in the Fulton State Hospital since January 24, 2007, and had continued to engage in consultations with Defendant's treatment team, the members of whom agreed Defendant was competent.

Following additional questioning of Dr. Kempker by the State and by Defendant, Defendant and the State both indicated they knew of no reason that Defendant was not competent to stand trial. Defendant's only asserted affirmative defense was defense of others, and Defendant specifically indicated that he was not raising the defenses of diminished capacity, incompetency to assist at trial, or not guilty by reason of insanity.

* * *

After the State rested its case, the trial court recalled Dr. Kempker to discuss progress notes Dr. Kempker had reviewed and brought from Fulton State Hospital. After reviewing the hospital's last two years of progress notes concerning Defendant, Dr. Kempker was even more confident that Defendant was competent to stand trial. Documented incidents regarding disciplinary actions taken against

Defendant while he was at the hospital revealed that when Defendant was dissatisfied with the consequences of his behavior, he would collect the opinions of people who may have witnessed the incident, present this information to a social worker or case manager, and argue that the consequences were either too severe or should be removed. Defendant was successful in getting some infractions reduced or removed. Dr. Kempker further testified that the notes also recorded instances where Defendant would represent to others that he was unable to read, but in group situations, Defendant would read from homework assignments or handouts without a problem.

Dr. Kempker diagnosed Defendant with schizophrenia, differentiated type, in full remission; anti-social personality disorder; borderline intellectual functioning; and malingering. Malingering is when an individual either exaggerates or feigns psychological systems for secondary gain. Dr. Kempker opined that Defendant was competent to stand trial, that he understood the legal proceedings against him and that he could assist in his own defense.

*State v. Whitt*, 330 S.W.3d 487, 488–90, 92 (Mo. Ct. App. 2010). The Court of

Appeals set forth the following facts detailing the evidence of the crimes:

Police Officer Theophilus Buford (Buford) testified on behalf of the State. On April 25, 2005, Buford was employed as a police officer with the St. Louis Metropolitan Police Department and received a call concerning a possible homicide. Buford responded to the call and proceeded to 4730 Lewis Place. When he arrived at that location, he approached Defendant, who was talking on a telephone.

Buford asked Defendant to finish his call; when Defendant hung up, he told Buford that he wanted to talk with someone because he had just killed his grandmother's boyfriend. Buford then read Defendant his rights, took him into custody, and placed Defendant in the back seat of his patrol car.

After Defendant indicated that he understood his rights, he continued to speak to Buford. Defendant told Buford that after Defendant had come home to the apartment where he lived with his grandmother and had found his grandmother "on the floor choked

- 6 -

out," he had gone after her boyfriend with a knife. Defendant told Buford that after he had initially stabbed the boyfriend, Defendant returned and stabbed him a couple more times in the stomach because he was upset. Defendant then changed clothes, threw the clothes he had been wearing away, and left the apartment. Defendant told Buford that he believed that his grandmother was dead and that she was cut. Defendant also told Buford that the boyfriend was dead.

George Weindel (Weindel) testified that on April 24, 2005, he was a police officer assigned to the Evidence Technician Unit, Laboratory Division of the St. Louis Metropolitan Police Department. On that date, he was called to the scene of a double homicide in an apartment on the eighth floor of the building at 711 North Euclid. In the course of processing the apartment, Weindel photographed the scene and the victims, and seized numerous objects. The male victim, Rodney Staples (Staples) was found lying on the floor of the apartment's kitchen area. The female victim, Mary Morant (Morant) was found lying in a hallway of the apartment, between the kitchen and the bedroom.

Among the items seized from the apartment by Weindel was a bloodstained carving knife with an 8-inch blade. Weindel also retrieved an 11-inch serrated electric knife blade; a bloody, bent kitchen knife with a five-and-a-half-inch blade and a broken tip; a bent and bloody spatula; a bloody butcher knife with a 9-inch blade; and a pair of bloody scissors.

When Weindel photographed Morant, he took a closeup of the blood that was on the bottom of her socks and the bent knife lying at the bottom of her feet. Morant's feet were in the kitchen and her head was at the doorway leading to the bedroom. A telephone was lying next to Morant's right shoulder. Weindel photographed some injuries to Morant's hands and wrist area. Morant also had injuries on one of her legs. Morant's underwear was bloodstained.

Staples was discovered lying in a pool of blood and broken glass with a substantial injury to his left shoulder. Staples's penis had been cut off and was lying on his right shoulder. A small paring knife with a 3-inch blade and a broken tip was found next to Staples's body.

St. Louis Metropolitan Homicide Detective Thomas Carol (Carol) testified that on April 24, 2005, he was assigned to the scene of a double murder at 711 North Euclid. As part of his duties, Carol interviewed Defendant, as the suspect in the homicides. After Carol read Defendant his rights, Defendant initialed and signed a Warning and Waiver Form. After Defendant signed the form, Defendant made a statement, which was audiotaped in accordance with Defendant's choice to do so.

Kamal Sabharwal, M.D. (Dr. Sabharwal) testified that he was a medical examiner who covered cases in the City of St. Louis and several other jurisdictions. In the course of his duties, Dr. Sabharwal performed an autopsy on Staples. Dr. Sabharwal's external examination of Staples's body revealed the presence of two cuts and one abrasion on the head; two stab wounds and one abrasion to the neck; three stab wounds and seven cut wounds to the chest and upper thorax area; six stab wounds to the abdomen; four cut wounds and one abrasion to the back; one cut wound to the buttocks; four cut wounds to the right arm and hand; two cut wounds to the left arm; and four cut wounds to the left leg. In genital area of Staples's body, the penis had been cut off. Dr. Sabharwal testified that there were at least 13 injuries to Staples's neck and chest area; one of the wounds to his chest was extremely large, and Dr. Sabharwal could not tell if that wound resulted from one injury or several injuries. This large injury had exposed soft tissue, and a portion of Staples's lung protruded from it. Any of the injuries to Staples's upper left chest area could have caused Staples's death. Dr. Sabharwal testified that some of the injuries were inflicted after Staples died, including a wound to the lower thorax, the stab wounds to Staples's abdomen, and the severing of Staples's penis.

Dr. Sabharwal also performed an autopsy on Morant. During his external examination of Morant's body, Dr. Sabharwal noted redness on the skin of the neck, an abrasion on the neck, and cut wounds to the hands. Upon internal examination, Dr. Sabharwal discovered injuries to the strap muscles of Morant's neck and two fractures of the hyoid bone, which sits high up in the neck. These injuries are consistent with a manual strangulation. Dr. Sabharwal also found bleeding into the soft tissue on both sides of Morant's

chest.  Dr. Sabharwal opined that the cause of Morant's death was strangulation.

Based on his training and experience as a forensic pathologist, Dr. Sabharwal believed that Staples died before Morant.  Looking at the crime scene pictures and seeing that Morant's socks were blood-soaked led him to believe that she was standing in blood prior to her death.  In contrast, when Dr. Sabharwal looked at Staples's feet, he found they were not soaked in blood.

* * *

At the close of the State's case, the trial court denied Defendant's oral Motion for Judgment of Acquittal.  At the conclusion of the proceedings, Defendant again moved orally for Judgment of Acquittal; his motion was again denied and the cause was taken under submission.  In a Judgment dated February 6, 2009, the trial court found Defendant guilty of two counts of murder in the first degree and one count of armed criminal action.  The trial court sentenced Defendant to two terms of life imprisonment without parole on the murder counts and to a term of ten years' imprisonment on the armed criminal action count, all terms to be served concurrently.

*State v. Whitt*, 330 S.W.3d 487, 490–92 (Mo. Ct. App. 2010).

In addition to the evidence recited above, a civilian named Duvalle Perry testified that he had been sitting in a car outside of the apartment at 4730 Lewis Place when Whitt approached and asked for a cigarette.  Whitt said that he had just killed his grandmother's boyfriend and had thrown his clothes down the trash chute.  Perry testified that he went into his nearby house, dialed 911, and took the phone to Whitt, who told the emergency operator what had happened.  Whitt then asked for the phone to call his aunt, and Perry overheard Whitt say into the phone that he had killed his grandmother's boyfriend.  During these events, Whitt

appeared to be crying and remorseful; Whitt responded sensibly to questions; and Perry could understand Whitt's statements.  Tr. 29–33.

## Standards of Review

Title 28 U.S.C. § 2254(d) mandates that a federal court grant habeas relief on a claim that was adjudicated on its merits by the state courts only "when the state court's decision [is] contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court [of the United States], or the [state court] decision [is ]based on an unreasonable determination of the facts in light of the evidence presented in the state court."  *de la Garza v. Fabian*, 574 F.3d 998, 1001 (8th Cir. 2009); *accord Christenson v. Ault*, 598 F.3d 990, 994 (8th Cir. 2010).  "A state court decision is contrary to clearly established federal law if it reaches a conclusion opposite to one reached by the [United States] Supreme Court on a question of law or decides the case differently than the [United States] Supreme Court has decided a case with a materially indistinguishable set of facts."  *de la Garza*, 574 F.3d at 1001; *accord Losh v. Fabian*, 592 F.3d 820, 823 (8th Cir. 2010).  "A state court decision involves an unreasonable application of clearly established federal law if, in the federal court's independent judgment, the relevant state court decision not only applied clearly established federal law incorrectly, but also did so unreasonably."  *de la Garza*, 574 F.3d at 1001.  "The unreasonable application inquiry is an objective one."  *Id.*;

*see Losh*, 592 F.3d at 823 (under the unreasonable application clause of § 2254, a habeas petition may be granted "only if the state court applied the correct governing legal principle in an objectively unreasonable manner").

Importantly, "[o]nly rulings in Supreme Court decisions issued before the state court acts are considered clearly established federal law, for a state court does not act contrary to or unreasonably apply clearly established federal law if there is no controlling Supreme Court holding on the point." *Losh*, 592 F.3d at 823 (citations omitted). The state court does not need to cite to Supreme Court cases, "'so long as neither the reasoning nor the result of the state-court decision contradicts them.'" *Revels v. Sanders*, 519 F.3d 734, 739 (8th Cir. 2008) (quoting *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam)).

"[T]he 'summary nature' of the [state court's] discussion of [a] federal constitutional question does not preclude application of the AEDPA standard." *Brown v. Luebbers*, 371 F.3d 458, 462 (8th Cir. 2004) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 131 S. Ct. 770, 784–85 (2011). Section 2254 (d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Id.* at 785.

Additionally, in a federal habeas action pursued by a state prisoner, "a determination of a factual issue made by a State court shall be presumed to be correct" unless rebutted by the petitioner by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The deference owed by a federal habeas court to a state court's findings of fact includes deference to state court credibility determinations, *Smulls v.Roper*, 535 F.3d 853, 864 (8th Cir. 2008) (en banc), and to "[a] state court's findings of fact made in the course of deciding" an ineffective assistance of counsel claim, *Odem v. Hopkins*, 382 F.3d 846, 849 (8th Cir. 2004). Moreover, the presumption of correctness of findings of fact applies to the factual determinations made by both the state's lower and appellate courts. *Smulls*, 535 F.3d at 864–65.

An accused's Sixth Amendment right to the assistance of counsel is a right to the effective assistance of counsel. *Marcrum v. Luebbers*, 509 F.3d 489, 502 (8th Cir. 2007) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 377 (1986)). "To show a constitutional violation of the right to counsel a [petitioner] must show first, that counsel's performance was deficient, and second, that counsel's errors prejudiced the defense." *Id.* (citations omitted) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Kellogg v. Skon*, 176 F.3d 447, 452 (8th Cir. 1999)).

To establish that counsel's performance was deficient, a petitioner must show that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Greiman v.*

*Thalacker*, 181 F.3d 970, 972 (8th Cir. 1999) (citing *Strickland*, 466 U.S. at 687). More specifically, a petitioner must demonstrate that "counsel's performance was so deficient as to fall below an objective standard of the customary skill and diligence displayed by a reasonably competent attorney." *Armstrong v. Kemna*, 534 F.3d 857, 863 (8th Cir. 2008) (citing *Strickland*, 466 U.S. at 687–89). "Only reasonable competence, the sort expected of the 'ordinary fallible lawyer,' is demanded by the Sixth Amendment." *White v. Helling*, 194 F.3d 937, 941 (8th Cir. 1999) (quoting *Nolan v. Armontrout*, 973 F.2d 615, 618 (8th Cir. 1992)). The court is highly deferential in analyzing counsel's conduct and "indulg[es] a strong presumption that counsel's conduct falls within the wide range of reasonable professional judgment.'" *Armstrong*, 534 F.3d at 863 (quoting *Middleton v. Roper*, 455 F.3d 838, 846 (8th Cir. 2006)).

To establish prejudice, a petitioner must demonstrate "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Armstrong v. Kemna*, 590 F.3d 592, 595–96 (8th Cir. 2009) (quoting *McCauley-Bey v. Delo*, 97 F.3d 1104, 1105 (8th Cir. 1996)). "'A reasonable probability is [a probability] sufficient to undermine confidence in the outcome.'" *Id.* at 596 (quoting *McCauley-Bey*, 97 F.3d at 1105; *accord Carroll v. Schriro*, 243 F.3d 1097, 1100 (8th Cir. 2001) (quoting *Strickland*, 466 U.S. at 694). The petitioner bears the burden of showing such a

reasonable probability. *Lawrence v. Armontrout*, 961 F.2d 113, 115 (8th Cir. 1992).

The question of prejudice from counsel's performance need not be reached if the performance was not deficient. *See Parkus v. Bowersox*, 157 F.3d 1136, 1140 (8th Cir. 1998). Conversely, the question of counsel's allegedly deficient performance need not be reached if a petitioner has failed to show prejudice. *See Strickland*, 466 U.S. at 697; *Williams v. Locke*, 403 F.3d 1022, 1025 (8th Cir. 2005).

## Discussion

Whitt raises five grounds for habeas relief. First, Whitt alleges error by the trial court for failing to require *sua sponte* a second competency hearing during trial. Second, Whitt alleges that there was insufficient evidence that he deliberated before killing Staples. The remaining three grounds allege that his trial counsel's performance was deficient for failing to raise the defenses of not guilty for reason of diminished mental capacity or mental disease, for failing to call witnesses as to Whitt's competency, and for failing to challenge his competency to waive his *Miranda* rights.

GROUND ONE:   Failure of Trial Court to Conduct Second Competency Hearing

As his first ground for relief, Whitt contends that the trial court erred by failing to *sua sponte* conduct a second competency hearing during the trial.

Although Whitt did not raise the issue at the trial court level, the Missouri Court of Appeals addressed this issue on direct appeal and found that the trial court did not commit error, plain or otherwise, in failing to order an additional competency evaluation *sua sponte*. *Whitt*, 330 S.W.3d at 493–94. A decision on the merits by state court overrides a bar to federal review derived from procedural default. *Sweet v. Delo*, 125 F.3d 1144, 1150 (8th Cir. 1997) (citations omitted). *But see id.* at 1152 (noting disagreement amongst panels).

Failure by the trial court to conduct a competency evaluation in the wake of evidence of incompetence violates the defendant's constitutional right to due process. *See Pate v. Robinson*, 383 U.S. 375, 385 (1966); *see also Beans v. Black*, 757 F.2d 933, 935 (8th Cir. 1985) ("Clearly a defendant is entitled to a hearing to determine his competency to stand trial when sufficient evidence is presented raising a 'bona fide doubt' as to his competency."). Competency to stand trial is a factual issue. *Beans*, 757 F.2d at 935. Thus, I defer to the decision of the state court unless that decision was contrary to or involved an unreasonable application of federal law as determined by the United States Supreme Court, or involved an unreasonable determination of facts. *Id.*; 28 U.S.C. § 2254(d).

The habeas petitioner has the burden to prove that "objective facts known to the trial court raise sufficient doubt to require a competency hearing." *Branscomb v. Norris*, 47 F.3d 258, 262 (8th Cir. 1995). The Supreme Court has held that a

trial court must remain vigilant to changed circumstances of competency. In *Drope v. Missouri*, the Court held that given the accused's actions, including attempted suicide, combined with unrebutted psychiatric and lay testimony of incompetence, as well as the inability of the trial court to observe the accused during trial, the trial court should have ceased trial pending a further competency hearing. 420 U.S. 162, 180–81 (1975).

Whitt argues that his statements to the court before and after trial, including his desire to "plead the Fourteenth Amendment," his inability to recall how long trial had lasted, and his desire to be sentenced to "10 or 20 years" for first-degree murder should have shown that he was incompetent to stand trial. The Missouri Court of Appeals analyzed these statements and found them unpersuasive. That court cited Dr. Kempker's testimony that Whitt was not only competent, but that Whitt had a history of feigning exacerbated symptoms when under clinical observation. "[A] medical opinion on the mental competency of an accused is usually persuasive evidence on the question of whether a sufficient doubt exists." *Griffin v. Lockhart*, 935 F.2d 926, 930 (8th Cir. 1991). Whitt's counsel obtained psychological examinations by two different doctors, but presented no evidence that Whitt was incompetent to stand trial.

Considering the evidence before the trial and appellate courts, I cannot say that either made unreasonable determinations in finding that no need existed for an

additional competency hearing.  Nor was the failure to order a competency hearing in violation of clearly established law:  the facts here are wildly different from those in *Drope*.  Whitt has not shown a violation of due process; he is not entitled to relief on Ground One.

GROUND TWO:  Insufficient Evidence of Deliberation

As his second ground for relief, Whitt asserts that he was denied due process because the evidence at trial was insufficient to show that he killed Rodney Staples after deliberation upon the matter.  Whitt points to the absence of threats or previous hostility between Whitt and Staples and the "lack of evidence of a prolonged struggle."  This issue was raised and addressed on direct appeal and so is preserved for review here.

In evaluating the sufficiency of the evidence, the correct standard is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Gibbs v. Kemna*, 192 F.3d 1173, 1175 (8th Cir. 1999) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Under Missouri law, deliberation "requires only a brief moment of 'cool reflection' and may be inferred from the fact that a defendant had the opportunity to terminate an attack after it began."  *State v. Cole*, 71 S.W.3d 163, 169 (Mo. banc

2002).  Although the presence of numerous wounds is not dispositive, it may support an inference of deliberation.  *Id.*

The Court of Appeals noted that Staples was stabbed or cut in excess of thirty times.  *Whitt*, 330 S.W.3d at 494.  One injury was so severe that a portion of Staples's lung protruded from the cut.  Whitt told Officer Buford that the stabbings occurred in at least two sessions.  Evidence of blood on at least four different knives, two of which had bent or broken blades, and a pair of bloody scissors support an inference that at some point, Whitt changed weapons.  There exists sufficient evidence for the fact-finder to have found that Whitt killed Staples after deliberating on the matter.  As such, it was not "an unreasonable determination of the facts" for the Missouri Court to find that deliberation had been proven beyond a reasonable doubt.  *de la Garza*, 574 F.3d  at 1001.  Whitt fails to show that he was denied due process, and he is not entitled to relief on Ground Two.

<u>GROUND THREE:   Ineffective Assistance of Counsel – Failure to Pursue Defense</u>

As his third ground for relief, and in light of his diagnoses of schizophrenia, anti-social disorder, and borderline intellectual functioning, Whitt alleges that his trial counsel was ineffective for not pursuing defenses of not guilty due to mental disease or diminished capacity.  This issue was properly exhausted and so may be reviewed on the merits.

The motion court examined the evidence and noted that Whitt's competency had been assessed several times over the course of several years. These assessments included the one by Dr. Kempker immediately before trial that found Whitt to be a "malingerer" who feigned psychological symptoms when it was to his benefit. Given such detrimental medical evidence, the court found it to be reasonable trial strategy not to pursue the defense sought by Whitt. *Whitt v. State*, No. 1022-CC01956, slip op. at 4–5 (22d Cir. Ct. Mo. Mar. 8, 2011). The appellate court, citing *Strickland*, found that Whitt had not overcome the heavy presumption that defense counsel's decision was reasonable. In addition to Kempker's testimony, the court cited testimony from those interacting with Whitt shortly after the stabbings that he had appeared remorseful, answered questions coherently, affirmed that he understood his *Miranda* rights, said that he had killed Staples in defense of his grandmother, and only became upset after he was instructed to disrobe for booking. Given that evidence, the court could not find deficient counsel's decision to eschew the defense of not guilty due to mental disease or diminished capacity.

Under Missouri law, a mental disease or defect provides a defense if the charged person "was incapable of knowing and appreciating the nature, quality, or wrongfulness" of the illegal conduct. *Compton v. State*, 172 S.W.3d 927, 929 (Mo. Ct. App. 2005); R.S. Mo. § 552.030. In contrast, diminished capacity is not really

a "defense"; rather, evidence admissible under that category addresses whether the defendant was capable of reaching the state of mind that is an element of the offense. *State v. Walkup*, 220 S.W.3d 748, 755 (Mo. banc 2007); R.S. Mo. § 552.015.2(8).

Both the motion court and the appellate court correctly stated the *Strickland* standard or the analogous standard under state law, which grants a strong presumption that defense counsel's strategy was reasonable. *See Strickland*, 466 U.S. at 669. As noted by the courts, the record is replete with evidence detrimental to the defense of not guilty by reason of mental disease or diminished capacity. Testimony by Perry that Whitt was crying and appeared remorseful after admitting that he had killed Staples undermines the requirement that the defendant be unable to appreciate the wrongfulness of the conduct. Other facts include testimony from Buford that Whitt understood that he was waiving his *Miranda* rights and only became upset when ordered to disrobe as part of booking, which goes to mental capacity generally. In contrast, there was some evidence supporting counsel's decision to argue that Whitt killed in defense of his grandmother.

There is a "strong presumption" that trial counsel's conduct is reasonable, *Armstrong*, 534 at 863, and the evidence supports that presumption. The conclusion of the Missouri courts that Whitt did not receive ineffective assistance of counsel based on choice of defense was not predicated on an unreasonable

determination of fact, nor was it contrary to or an unreasonable application of federal law. Whitt has not established a violation of his due Sixth Amendment right to counsel, and he is not entitled to relief on Ground Three.

GROUND FOUR:   Ineffective Assistance of Counsel – Failure to Call Witnesses

As his fourth ground for relief, Whitt alleges that his trial counsel was ineffective for failing to call Whitt's mother and prior doctors who had initially found him incompetent to stand trial to testify that Whitt was genuinely incompetent to proceed.

Whitt asserted this ground in his motion for post-conviction relief in state court and renewed the ground on appeal. On post-conviction appeal, the court noted that Whitt failed to allege the content of the proposed witnesses' testimony. Absent that context, the court was unable to say that the failure to elicit testimony from the witnesses prejudiced Whitt. The motion court determined that the non-expert testimony of Whitt's mother would be insufficient to overcome the expert testimony of Dr. Kempker. It also found that testimony from doctors who had last treated Whitt two years before trial was not relevant to his competency at the time of trial. Since at least one state court reached the claim on the merits, I too may address the merits. *Battle v. Delo*, 19 F.3d 1547, 1554 (8th Cir. 1994), *modified*, 64 F.3d 347 (8th Cir. 1995).

Whitt fails here to articulate what any of the witnesses might have said, though he believes the testimony would show that he was not faking his conditions. With nothing more, mere speculation that a witness *might* have testified in a way to support a theory of defense is "simply inadequate to 'undermine confidence in the outcome.'" *Sanders v. Trickey*, 875 F.2d 205, 210 (8th Cir. 1989) (quoting *Strickland*, 466 U.S. at 694). As such, the Missouri Court of Appeals's determination that petitioner's mere speculation as to what his mother's and former doctors' testimony would have been was insufficient to establish prejudice under *Strickland* was neither contrary to nor an unreasonable application of clearly established federal law.

Nor has Whitt established that the court's competency determination would have resulted in a different outcome absent counsel's failure to elicit lay testimony or out-of-date medical testimony. First, the credibility of Whitt's mother could have been called into question, negating any potential prejudice. *See McCauley-Bey*, 97 F.3d at 1106. Second, though the two doctors did find Whitt initially incompetent to proceed, the Court received testimony from Dr. Kempker, including reports from the facility in which Whitt had been held in the ensuing years, that Whitt's psychological difficulties had abated and that he had repeatedly demonstrated his ability to fake exaggerated symptoms of incompetency. Thus, the testimony of the doctors would have been weakened by facts uncovered in the

intervening years. *See id.* (finding inference of prejudice diminished by interplay between witnesses). Whitt has not established a reasonable probability that, absent counsel's failure to call these witnesses, the result of the proceeding would have been different; Ground Four lacks merit.

GROUND FIVE: Ineffective Assistance of Counsel – Failure to Litigate
Competency to Waive *Miranda* Rights

Whitt argues that because he was found to be incompetent to stand trial shortly after his initial appearance in the criminal case, his counsel at trial was incompetent for failure to argue that his *Miranda* waivers were invalid and that his confessions should have been suppressed. This argument substantially tracks the argument made in Whitt's motion for post-conviction relief, and so is preserved for review here.

The motion court ruled on the merits that Whitt was competent to waive his *Miranda* rights; it based this determination on reports of Whitt's actions and his responses to questions posed near the time of the waiver. The post-conviction-relief appellate court, in turn, found that Whitt was not prejudiced by the admission of his confession to Officer Buford. The appellate court relied upon testimony adduced at trial from Officer Buford that Whitt had informed Buford that he "wanted to talk with someone because he had just killed his grandmother's boyfriend." This statement occurred before Whitt was arrested or otherwise placed into custody, and therefore it was not barred from admission under *Miranda*. The

court also noted testimony from Perry that Whitt had informed Perry, a 911 operator, and a family member that he had killed Staples. The court finally noted that DNA evidence tied Whitt to the crimes.

The procedural safeguards prescribed by Miranda only apply to persons who are subjected to interrogation and who are in custody. *Montejo v. Louisiana*, 556 U.S. 778, 795 (2009); *Oregon v. Mathiason*, 429 U.S. 492, 494–95 (1977). To be sure, police questioning always involves some degree of pressure to confess. *Mathiason*, 429 U.S. at 495. But in a noncustodial situation, there are no "inherently compelling pressures" to confess, which make these situations the least likely to pose a risk of coerced waivers. *Montejo*, 556 U.S. at 795. "When a defendant is not in custody, he is in control, and need only shut his door or walk away to avoid police badgering." *Id.*

Upon consideration, Whitt fails to satisfy the prejudice prong of the *Strickland* test. Even if Whitt's custodial statements should have been barred under *Miranda*, the government elicited admissible testimony from two different witnesses that Whitt twice admitted in a non-custodial setting to killing Staples. Moreover, the record reflects that blood samples from Whitt's clothes were spotted with DNA from his grandmother, samples from the clothes in the trash chute had DNA from Staples and Whitt on them, and that Whitt's own DNA was mixed with both victims' in blood samples taken from the apartment. Tr. 321–44. Under the

above facts, there can be no "reasonable probability" that the trial outcome would have been different. *Strickland*, 466 U.S. at 694. Because Whitt fails to show that the outcome of his trial would have been any different had his counsel successfully challenged the admission of his custodial statement to Officer Buford or his later confessions, his claim for relief on this ground fails. I will deny the petition.

## Certificate of Appealability

Under 28 U.S.C. § 2253, an appeal may not be taken to the court of appeals from the final order in a 28 U.S.C. § 2254 proceeding unless a circuit justice or judge issues a Certificate of Appealability. 28 U.S.C. § 2253(c)(1)(A). To grant such a certificate, the justice or judge must find a substantial showing of the denial of a federal constitutional right. *Id.* § 2253(c)(2); *see Tiedeman v. Benson*, 122 F.3d 518, 522 (8th Cir. 1997). A substantial showing is a showing that issues are debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings. *Cox v. Norris*, 133 F.3d 565, 569 (8th Cir. 1997). I find that reasonable jurists could not differ on any of Whitt's claims, so I will deny a Certificate of Appealability on all claims.

Accordingly,

**IT IS HEREBY ORDERED** that the petition of Jamel Whitt for writ of habeas corpus under 28 U.S.C. § 2254 [# 1] is **DENIED**.

**IT IS FURTHER ORDERED** that as Whitt has not made a substantial showing of the denial of a constitutional right, this Court will not issue a certificate of appealability.

A separate judgment in accordance with this Memorandum and Order is entered this same date.

_Catherine D. Perry_
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 23rd day of July, 2014.